# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

JAHMEZ L. CONNALLY,

    **Petitioner,**

    **v.**

WARDEN, TIM BUCHANAN,

    **Respondent.**

**Case No. 2:17-cv-729**
**Judge Michael H. Watson**
**Magistrate Judge Chelsey M. Vascura**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  This matter is before the Court on the Petition, Respondent's Return of Writ,

Petitioner's Reply and the exhibits of the parties.  For the reasons that follow, the Magistrate

Judge **RECOMMENDS** that this action be **DISMISSED.**

**Facts and Procedural History**

The Ohio Court of Appeals, Tenth District, described the factual and procedural history

of Petitioner's conviction as follows:

> By indictment filed March 13, 2015, plaintiff-appellee, State of
> Ohio, charged Connally with one count of aggravated burglary in
> violation of R.C. 2911.11, a first-degree felony; two counts of
> aggravated robbery in violation of R.C. 2911.01, first-degree
> felonies; two counts of robbery in violation of R.C. 2911.02,
> second-degree felonies; two counts of robbery in violation of R.C.
> 2911.02, third-degree felonies; and two counts of kidnapping in
> violation of R.C. 2905.01, first-degree felonies. All nine counts in
> the indictment contained accompanying firearm specifications. The
> charges related to a home invasion at Shannon Green Drive in
> Columbus. Connally entered a plea of not guilty.
>
> At a jury trial commencing November 30, 2015, D.W. testified she
> was living at her mother's apartment in January 2015 along with
> her mother, step-father, and brother. D.W. stated that on January 8,
> 2015 she was "lounging around" the apartment with her brother at

approximately 5:00 p.m. when "a home invasion" occurred in which "[p]eople invaded [their] space and came and got [their] belongings at gunpoint." (Tr. Vol. II at 55–56.) Prior to the home invasion, D.W. stated that at approximately 3:30 or 3:45 p.m., someone knocked on the door but that D.W. was upstairs in her room and her brother answered the door. She stated her brother told her that "his friend [N.N.] wanted to borrow [her brother's] PlayStation charger cord" but that her brother did not have such a cord, and the people who knocked at the door then left. (Tr. Vol II at 58.)

By 5:00 p.m. that same day, D.W. stated she was in the kitchen cooking and talking on the phone to her boyfriend while her brother was in the living room. D.W. further testified:

> And there was a knock at the door and two guys just barged in my house like through the front door and was basically fighting my brother, and my brother ended up kind of fighting with one of the guys. And I tried to run out the back door. I was kind of just standing there for a moment because I was shocked about what was happening. So I was trying to— after I actually found out what was going on, and the guys had hoods on and stuff, okay, this is probably a robbery. And I[saw] the gun in his hand, so I tried to run to the back door, but he grabbed me.

(Tr. Vol. II at 59.) After the person with the gun grabbed her, D.W. stated he made her hang up the phone, walked her to the back door, covered her eyes, and told her to unlock the back door. While her eyes were covered, D.W. stated she heard the person with the gun telling other people to come into her house. D.W. testified that the person with the gun walked her toward the front of the house and made her sit down next to her brother, and she saw "four people all in black" going up the steps. (Tr. Vol. II at 63.) Approximately five minutes later, D.W. stated the person holding the gun told her and her brother to get into the closet and told them they "better have the door shut or he was going to shoot through the door." (Tr. Vol. II at 64.) D.W. stated she and her brother got into the closet and "that's when everybody else came downstairs and left out the back door." (Tr. Vol. II at 64.) After a couple of minutes, D .W. and her brother left the closet and her brother went next door to use the neighbor's phone to call 911.

D.W. testified she did not get a good look at the person fighting with her brother other than noting he was wearing a light blue jacket and camouflage cargo pants, but she stated she did get a good look at the person who charged toward her with a gun. She described the man with the gun as a black male with lighter skin, approximately 20 years old, 5 feet, 9 inches tall, and approximately 130 pounds. D.W. stated he was wearing a black coat, a gray hooded sweatshirt with drawstrings, and gray sweatpants. When the police arrived a few minutes later, D.W. stated she gave them the same description of the individual with the gun.

The day after the home invasion, D.W. testified she went to the rental office of the apartment complex and asked to view surveillance video from the previous day. The surveillance showed a group of people hanging around the apartment complex, and D.W. stated she recognized "the one with the camouflage pants" as one of the individuals who had entered her home during the home invasion. (Tr. Vol. II at 76.) In the surveillance video, she also saw a person wearing a gray hooded sweatshirt and a black jacket.

D.W. testified that police asked her to try to identify the gunman from a photo lineup on January 14, 2015, but she was unable to identify a suspect from that lineup. Police then asked D.W. to look at a second photo array on January 20, 2015. D.W. stated she circled photograph number two, which was not a picture of Connally, believing "this could possibly be the gunman," and she wrote on the photo array form "[n]one of the pictures stood out to [her] because the suspect had cat-like eyes and a mustache with a sharp nose." (Tr. Vol. II at 81–82.) Then, on March 4, 2015, police showed D.W. a third photo array, and this time she circled a photograph of Connally, writing that the individual "has the features of gunman and looks like gunman." (Tr. Vol. II at 85.) In court, D.W. identified Connally as the gunman from the home invasion. D.W. testified she had never seen Connally before the home invasion.

L.G., who was 16 years old at the time of the home invasion and is D.W.'s brother, testified that on January 8, 2015, he was at home when his friend N.N. and two other people knocked on his door asking if they could borrow a PlayStation controller. One of the other people with N.N. was wearing camouflage pants, but L.G. did not know who he was. L.G. stated he recognized the third person as J.B., someone with whom he attended summer school. L.G. stated he told N.N. he did not have a PlayStation controller and the three of them walked away.

At approximately 5:00 p.m. on January 8, 2015, L.G. stated he heard a knock at the door and when he answered the door, two people pushed the door in. He stated he tried to close the door, but the two people forced their way inside the house. L.G. stated the first person in the door was wearing camouflage pants and the other person ran into the kitchen where his sister was making dinner. L.G. engaged in a physical struggle with the person in camouflage pants, and the other person grabbed his sister and put a gun to her head. While he was wrestling with the person in the camouflage pants, L.G. said he recognized that person as C.F.

L.G. testified that the gunman had the gun out the entire ten minutes he was in L.G.'s house and that the gun was a silver semi-automatic pistol with a black handle. L.G. stated the gunman instructed L.G. and his sister to sit down on the couch in the living room, and they watched as four other people entered the apartment and went upstairs with C.F. L.G. recognized one of those four people as J.B. because he was the only one who did not have his face covered up by a hooded sweatshirt. L.G. said he could hear things moving and being thrown around upstairs, and he estimated the five people were upstairs for approximately five minutes. L.G. testified that the gunman pointed the gun at him and his sister the entire time they were seated on the couch.

When the five men ran back down the steps, L.G. said they ran immediately out of the house. At that point, the gunman told L.G and his sister that if they moved, he would shoot them, and he told them to get in the closet and stay there or else he would shoot. L.G. testified that he went into the closet with his sister, stayed in there for approximately one minute, and then exited the closet to see the back door open and all the individuals gone. L.G. stated the individuals left with two pairs of his shoes, a pair of his step-father's shoes, his headphones, and his PlayStation video game console. Additionally, L.G. stated the gunman took his cell phone and his sister's cell phone before he left the house. After the gunman and the others left the apartment, L.G. said he ran next door to his neighbor's house to call 911.

The state played the audio recording of L.G.'s 911 call for the jury. In the recording, L.G. tells the operator "[s]omebody just broke into my house while we [were] in it and they put a gun to my face, and they took my stuff." (Tr. Vol. II at 135–36.) L.G. told the operator there were "six dudes" who were "all black," and he said they were teenagers. (Tr. Vol. II at 136 .) L.G. further told the 911 operator that all of the people were wearing hoodies and that he thought he had seen one of them before.

When police later asked L.G. to look at a photo array of suspects, he identified C.F. as the person who forced the door open and was wearing the camouflage pants. At a later date, police asked L.G. to look at another photo array, and L.G. picked photo number two, writing "[n]ot positive, same facial features, looks like the guy with the gun, similar." (Tr. Vol. II at 186.) Photo number two was a picture of Connally. At trial, L.G. identified Connally as the person who barged into his home and held him at gunpoint, saying he was "[p]ositive" Connally was the gunman. (Tr. Vol. II at 190.)

C.F. testified and admitted his involvement in the home invasion and, at the time of trial, was being held at the juvenile detention center. C.F. identified Connally as the gunman in the home invasion. C.F. stated that prior to the home invasion, he did not personally know Connally but he had "heard of him" because Connally is J.B.'s brother. (Tr. Vol. II at 211.)

According to C.F.'s testimony, about one week before the home invasion he was "jumped" by approximately 30 people and someone stole his shoes. (Tr. Vol. II at 213.) N.N. told C.F. that he had heard that L.G. was "bragging and boasting" that he had C.F.'s shoes, so C.F. talked to N.N. about going to get the shoes from L.G. (Tr. Vol. II at 214.) C.F. and N.N. devised a plan to break into L.G.'s house when no one was home on the weekend, get the shoes, and leave. J.B. agreed to help.

When school was cancelled due to snow on January 8, 2015, C.F., N.N., and J.B. decided to break into the house that day because they thought L.G. would be at work. They first knocked on the apartment door to see if anyone was home, and L.G. answered the door. After a brief conversation with L.G. about borrowing a PlayStation controller, C.F., N.N., and J.B. went to the apartment complex clubhouse to regroup and decide how to carry out their plan since they had not expected anyone to be in the apartment. At that point, N.N. had to go home, and C.F. stated that J.B. called Connally and asked him to come help them "kick the door." (Tr. Vol. II at 230.) Connally agreed to help.

Approximately 10 or 20 minutes later, C.F. stated Connally arrived at the apartment complex along with another man identified only as "B." (Tr. Vol. II at 231.) C.F. stated that both Connally and "B" had guns, and that Connally's gun was an all black semi-automatic pistol while "B's" gun was a chrome semi-automatic pistol. C.F. stated that he knocked on the door and started "tussling" with L.G., and Connally went inside the house and put a gun to L.G.'s sister's

head. (Tr. Vol. II at 237.) When C.F. eventually went upstairs to grab some items and then left the house, he stated he heard Connally tell L.G. and D.W. to "[g]et in the closet, don't move and don't come out before we leave. If you come out before we leave I'm going to come back and kill you." (Tr. Vol. II at 243.)

The next day at school, police arrested C.F. on unrelated robbery charges. C.F. pled guilty in that case in juvenile court. The state also charged C.F. for his involvement in the home invasion at L.G.'s apartment. He entered a guilty plea to aggravated burglary, aggravated robbery, and accompanying firearm specifications. In exchange for his plea agreement, C.F. agreed to testify against Connally, and he stated he understood that if he did not provide truthful testimony, he could be bound over to the general division of the common pleas court for sentencing.

James Howe, a detective with the Columbus Division of Police, testified that as part of his investigation into the home invasion, he examined Connally's cell phone. Over defense counsel's objection, the state introduced into evidence ten photographs appearing on Connally's phone between January 31 and February 16, 2015. Some of the photographs showed Connally holding two guns, one of which was a silver and black semi-automatic pistol. Other photographs were close-ups of the gun on a table or in someone's hand taken at various angles. In one of the photographs, Connally is holding the silver and black pistol and aiming it directly at the camera.

Phillip Thomas, a detective with the Columbus Division of Police, testified that he saw Connally at juvenile court on March 4, 2015 for J.B.'s court date, just after L.G. and D.W. identified Connally in a photo array as the gunman from the home invasion. Detective Thomas arrested Connally at that point. Detective Thomas then interviewed Connally later that day, and Connally admitted to going to the victims' apartment complex that day to drop J.B. and C.F. off, and he admitted to picking them up later. When Detective Thomas asked Connally whether he owned or possessed a gun, Connally responded "[h]uh-uh." (Tr. Vol. IV at 513.) Detective Thomas stated that C.F., J.B., and N.N. have all entered guilty pleas related to their involvement in the home invasion.

At the conclusion of trial, the jury returned guilty verdicts on all counts and specifications. Following a January 8, 2016 sentencing hearing, the trial court sentenced Connally to an aggregate prison term of nine years. The trial court journalized Connally's

convictions and sentence in a January 15, 2016 judgment entry. Connally timely appeals.

II. Assignments of Error

Connally assigns the following errors for our review:

[1.] The trial court erred by admitting photographs M1 through M10 into evidence.

[2.] The trial court's finding of guilty was against the manifest weight of the evidence and was not supported by sufficient evidence.

*State v. Connally*, No. 16AP-53, 2016 WL 6464450, at *1-5 (Ohio App. 10th Dist. Nov. 1, 2016). On November 1, 2016, the appellate court affirmed the judgment of the trial court. *Id.* On May 31, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Connally,* 149 Ohio St.3d 1421 (2017). On December 12, 2016, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (ECF No. 8, PAGEID # 159.) On February 9, 2017, the appellate court denied the Rule 26(B) application. (PAGEID # 199.) On May 31, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (PAGEID # 216.)

On August 18, 2017, Petitioner filed his Petition For Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. As his sole claim for relief, Petitioner asserts that he was denied the effective assistance of appellate counsel because his attorney failed to consult with him before filing the appellate brief, and as a result, did not raise on appeal issues demonstrating Petitioner's innocence. It is the position of the Respondent that this claim is procedurally defaulted and without merit.

**Standard of Review**

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the standards of the

Antiterrorism and Effective Death Penalty Act ("the AEDPA") govern this case. The United

State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for

prisoners whose claims have been adjudicated in state court" and emphasized that courts must

not "lightly conclude that a State's criminal justice system has experienced the 'extreme

malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 134 S. Ct. 10, 16

(2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559

U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-

court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal

quotation marks, citations, and footnote omitted).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and

forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated

on the merits in State court proceedings" unless the state court decision either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under the AEDPA, the factual findings of the state court are presumed to be

correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)), *cert. denied sub nom. Coley v. Robinson,* 134 S. Ct. 513 (2013). The United States Court of Appeals for the Sixth Circuit has summarized these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L.Ed. 2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed. 2d 389.

*Id*. at 748–49. The burden of satisfying the AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

**Ineffective Assistance of Counsel**

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011)

(citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). Strickland requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687. *See also Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir.), *cert. denied sub nom. Hale v. Hoffner*, 134 S. Ct. 680 (2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. App'x 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler,* 658 F.3d 525, 536 (6th Cir. 2011), *cert. denied*, 566 U.S. 947 (2012) (citing *Strickland*, 466 U.S. at 687)) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 122 (2014). To make such a showing, a petitioner must overcome the "strong [ ] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 687. "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

> The *Strickland* test applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).... Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id.* citing *Wilson* . . . . The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751–752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." 463 U.S. 751–52).

*Leonard v. Warden, Ohio State Penitentiary,* No. 1:09-cv-056, 2013 WL 831727, at *28 (S.D. Ohio March 6, 2013). Factors to be considered in determining whether a defendant has been denied the effective assistance of appellate counsel include:

> (1) Were the omitted issues "significant and obvious"?
>
> (2) Was there arguably contrary authority on the omitted issues?
>
> (3) Were the omitted issues clearly stronger than those presented?
>
> (4) Were the omitted issues objected to at trial?
>
> (5) Were the trial court's rulings subject to deference on appeal?
>
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> (7) What was appellate counsel's level of experience and expertise?
>
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
>
> (9) Is there evidence that counsel reviewed all the facts?
>
> (10) Were the omitted issues dealt with in other assignments of error?
>
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir.), *cert. denied*, 528 U.S. 946 (1999) (citations omitted).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' id., at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L.Ed. 2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles*, 556 U.S., at 123, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under

§ 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Premo v. Moore*, 562 U.S. 115, 122-23 (2011) (some internal quotation marks omitted). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable[;] [t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101.

Petitioner asserts that his attorney improperly failed to argue on appeal that evidence failed to establish that the armed gunman used any of the weapons depicted in photographs of firearms Petitioner owned; that the alleged victims had been unable initially to identify him as the gunman, even though he was sitting in the hallway outside only feet away from them at the time; that Detective Howe lied when he stated he did not know the identity of Petitioner when conducting the photo line-up, as Howe had performed the analysis of Petitioner's cell phone; and that police improperly failed to take photographs of footprints in the snow made by the perpetrators of the offense, which may have shown that Petitioner's footprints were not among them, where the police had custody or access to Petitioner's shoes. Petitioner complains that his appellate counsel also failed to submit an affidavit from his brother and co-defendant Jaisean Burnett, dated December 22, 2015, in which Burnett, states that Petitioner is innocent and Carlos falsely testified against Petitioner solely in order to obtain a reduced sentence. (ECF No. 1, PAGEID # 10.)

The state appellate court rejected Petitioner's claim of ineffective assistance of appellate counsel, reasoning in relevant part as follows:

> During his appeal, Connally, through counsel, argued the trial court erred in admitting ten different photographs into evidence and that his convictions were against both the sufficiency and the

manifest weight of the evidence. Connally now argues his appellate counsel was ineffective for failing to consult with him before submitting the appellate brief and for failing to argue allegedly exculpatory evidence would have warranted reversal of his convictions.

&ast; &ast; &ast;

Connally [] argues his appellate counsel was ineffective in failing to argue that various inconsistencies in the evidence warranted reversal of his convictions. Inconsistencies in the evidence are part of a manifest weight challenge, and Connally's appellate counsel assigned as error that the convictions were not supported by the manifest weight of the evidence. *See State v. Raver,* 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21 (a jury may take note of the inconsistencies in the evidence and resolve them accordingly). We noted in our resolution of that assignment of error that we independently reviewed the record of the trial proceedings and determined the manifest weight of the evidence supported Connally's convictions. *Connally* at ¶ 44.

Nonetheless, Connally argues his appellate counsel was ineffective for failing to highlight six specific inconsistencies in the evidence. Having reviewed Connally's argument and the accompanying evidence, we conclude there is no reasonable probability of a different outcome if appellate counsel had raised these arguments on appeal. Some of Connally's arguments mirror the arguments that his appellate counsel did, in fact, make during the appeal, while the other arguments are wholly meritless. There was more than sufficient evidence to convict Connally, and Connally does not establish either prong of the *Strickland* analysis. Accordingly, Connally's appellate counsel was not ineffective for failing to raise these arguments on appeal.

Memorandum Decision (ECF No. 8, PAGEID # 199-201.) The record does not reflect that the state appellate court unreasonably applied Strickland, or based its decision on an unreasonable determination of the facts in light of the evidence presented so as to warrant federal habeas corpus relief. 28 U.S.C. § 2254(d).

Appellate counsel argued at length, unsuccessfully, that the trial court improperly admitted various photographs obtained from Petitioner's cell phone depicting the Petitioner in the possession of various firearms. The appellate court described the photographs as follows:

> In photograph M1, Connally is seen in the driver's seat of a vehicle holding two firearms, one of them a black and silver pistol and the other a black revolver. Photograph M2 shows Connally standing up holding a black pistol in one hand and a black revolver in the other hand. Photographs M3, M4, and M9 are close-up photographs of a black and silver pistol on a wooden surface. Photographs M5, M6, and M10 are close-up photographs of a black and silver pistol in someone's hand. Photograph M7 depicts Connally holding two black and silver pistols, one in each hand, and looking down at the weapons. Finally, photograph M8 depicts Connally holding two black and silver pistols, resting one gun against his cheek and aiming the other gun directly at the camera.

*State v. Connally*, 2016 WL 6464450, at *5. As discussed by the state appellate court, alleged victim "L.G." stated that the Petitioner used a black and silver pistol in the commission of the offenses charged. (*Transcript*, ECF No. 8-2, PAGEID # 343, 345.) According to co-defendant "C.F.," "B" used an all chrome semi-automatic pistol, and Petitioner carried an all black semi-automatic pistol. (PAGEID # 460.) In view of the foregoing, further argument by appellate counsel on the description of the firearms used as purportedly not matching the firearms in Petitioner's photographs would not have assisted him.

Likewise, the record does not reflect that further argument regarding the lack of footprint evidence would have assisted the Petitioner. L.G. testified that six people exited from the back door of the house. (PAGEID # 418-19.) However, Officer Christopher Lieb could only identify two sets of footprints. "[T]hey said that six people had entered the apartment . . . [, b]ut if they went out the back door and went down the sidewalk I wouldn't have been able to follow any footprints that way because the snow was pretty compacted." (PAGEID # 549.)

Further, and despite Petitioner's argument to the contrary, appellate counsel did raise on appeal the claimed unreliability of eyewitness identifications, in connection with his claim that his convictions were against the manifest weight. (*Brief of Appellant,* ECF No. 8, PAGEID # 85-86.) Although Burnett's affidavit apparently was made a part of the trial record (see Memorandum Contra Defendant's Application to Reopen, ECF No. 8, PAGEID # 183), Petitioner does not indicate, and the record does not reflect, in what manner the Affidavit would have assisted him on direct appeal.

Petitioner's claim of the denial of the effective assistance of appellate counsel lacks merit.

**Procedural Default**

Respondent maintains that Petitioner has waived his remaining arguments of the denial of the effective assistance of appellate counsel by failing to present a sworn affidavit in support as required under Appellate Rule 26(B)(2)(d), and failing, in part, to present his claim in Rule 26(B) proceedings. For the reasons that follow, the Court agrees.

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6, 103 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).

Where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas . . . ." *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This requires the petitioner to present "the same claim under the same theory" to the state courts before raising it on federal habeas review. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. In the words used by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case-that is, they are procedurally defaulted.

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually

enforced the state procedural sanction. *Id.* Third, the Court must determine whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that the petitioner did not comply with a state procedural rule and that the rule was an adequate and independent state ground, then the petitioner must demonstrate cause for his failure to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir.), *cert. denied sub nom. Leroy v. Morris,* 474 U.S. 831 (1985).

In light of the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray*, 477 U.S. at 479. That is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir.), *cert. denied*, 546 U.S. 1017 (2005). Or, if the claim is procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards*, 529 U.S. at 450–51. The Supreme Court explained the importance of this requirement:

We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in Coleman: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S. Ct. 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to " 'protect the integrity' of the federal exhaustion rule." *Id*. at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by " 'letting the time run' " so that state remedies were no longer available. *Id*. at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].' " *Id*. at 854, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S. Ct. 587, 94 L.Ed. 761 (1950)).

*Id*. at 452–53.

If, after considering all four factors of the *Maupin* test, the Court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray*, 477 U.S. at 495–96), *cert. denied*, 135 S. Ct. 1545 (2015).

The state appellate court refused to address the issue regarding appellate counsel's alleged failure to consult with Petitioner, due to Petitioner's failure to file an affidavit in support as required under Rule 26(B)(2)(d):

> As to Connally's argument that his appellate counsel was ineffective for failing to consult with him before filing the appellate brief, we note that there is nothing in the record to support Connally's claim. "[T]he application process under App.R. 26(B) requires that an applicant submit additional matter not in the record of the trial court to support claims that appellate counsel was ineffective." *Morgan v. Eads*, 140 Ohio St.3d 142, 2004-Ohio-6110, ¶ 11. Under App.R. 26(B), an applicant seeking to demonstrate ineffective assistance of appellate counsel based on evidence not included in the original appellate record must file, as necessary, a "sworn statement of the basis for the claim," and any "supplemental affidavits upon which the applicant relies." App.R. 26(B)(2)(d) through (e). Though Connally asserts in his application that his appellate counsel failed to consult with him, Connally did not submit either a sworn statement in that regard or any supplemental affidavits to demonstrate his assertion. Because there is nothing in the record to support Connally's argument that his appellate counsel did not consult with him, that argument cannot be the basis for his claim of ineffective assistance of appellate counsel. *See State v. Davis*, 10th dist. No. 09AP-869, 2011-Ohio-1023, ¶ 12 (noting matters which are outside the record do not provide a basis for reopening on appeal).

Memorandum Decision (ECF No. 8, PAGEID # 201.) Petitioner has thereby waived this issue for review in these proceedings. *See Burke v. Turner,* No. 2:16-cv-01076, 2017 WL 5157701, at *4 (S.D. Ohio Nov. 7, 2017) (enforcing procedural default on this same basis) (citing *Gooden v. Bradshaw*, No. 5:12-cv-2139, 2014 WL 4245951, at *10 (N.D. Ohio Aug. 25, 2014); *Belcher v. Smith*, No. 1:09-cv-627, 2010 WL 256501, at *6 (N.D. Ohio Jan. 21, 2010) (concluding that the requirement of a sworn supporting affidavit under Rule 26(B)(2)(d) constitutes an adequate and independent ground under *Maupin*) (citations omitted)).

Additionally, Petitioner did not assert in Rule 26(B) proceedings his claim that appellate counsel performed in a constitutionally ineffective manner by failing to raise an issue regarding

police errors in identification procedures. He may now no longer do so under Ohio's doctrine of *res judicata. See State v. Cole*, 2 Ohio St. 3d 112, 115 (1982); *State v. Perry*, 10 Ohio St. 2d 175, 180 (1967) (claims must be raised on direct appeal, if possible, or they will be barred by the doctrine of res judicata.). The state courts were never given an opportunity to enforce this procedural rule due to the nature of Petitioner's procedural default.

Ohio's doctrine of *res judicata* is adequate and independent under the third part of the Maupin test. To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *See Coleman*, 501 U.S. at 732–33. To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia*, 498 U.S. 411, 423 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id*. (quoting *James v. Kentucky*, 466 U.S. 341, 348–351 (1984)); *see also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 297 (1964). The United States Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e*., the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001), *cert. denied sub nom. Coleman v. Bagley*, 535 U.S. 1031 (2002); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000) *cert. denied*, 531 U.S. 1082 (2001); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir.), *cert. denied*, 525 U.S. 935 (1998). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata*, to review the merits of claims because they are procedurally barred. *See Cole*, 2 Ohio St.3d at 112; *State v. Ishmail*, 67 Ohio St.2d 16, 18 (1981). Additionally, the doctrine of *res*

*judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that Ohio's doctrine of *res judicata* in this context does not rely on or otherwise implicate federal law. Accordingly, the Court is satisfied from its own review of relevant case law that the *Perry* rule is an adequate and independent ground for denying relief.

Petitioner has failed to establish cause for these procedural defaults. Moreover, the record does not indicate that Petitioner can establish that he is actually innocent so as to obtain a merits review of these claims. *See Souter v. Jones*, 395 F.3d 577, 589-90 (6th Cir. 2005).

**Recommended Disposition**

For the foregoing reasons, it is **RECOMMENDED** that this action be **DISMISSED.**

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of

the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ *Chelsey M. Vascura*___
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE
